ROBERT SANDER *v.* HOLLY SANDER
(AC 26291)

Gruendel, Harper and Pellegrino, Js.

Argued February 6—officially released June 20, 2006

*Fatima T. Lobo,* for the appellant (plaintiff).

*Keith Yagaloff,* for the appellee (defendant).

GRUENDEL, J. The plaintiff, Robert Sander, appeals from the judgment of the trial court dissolving his marriage to the defendant, Holly Sander. On appeal, the plaintiff claims that the court improperly (1) entered financial orders because it (a) incorrectly valued his business and the salary he drew therefrom, (b) incorrectly considered a third party's income when awarding alimony and (c) failed to comply with the child support guidelines; (2) ordered the sale of the parties' Vermont property; and (3) entered an educational support order for the parties' minor child because it (a) failed to comply with General Statutes § 46b-56c and (b) impermissibly allocated assets to fund the order. We affirm the judgment of the trial court.

The parties were married on August 12, 1978, and have one minor child. In March, 2003, the plaintiff filed a complaint for dissolution of the parties' marriage, stating that the marriage had broken down irretrievably. The dissolution matter was tried to the court on November 23 and 24, 2004. On January 5, 2005, the court dissolved the parties' marriage and entered various financial orders, including alimony and child support,[1] divided the parties' assets and established an educational support trust for the parties' daughter. The plaintiff filed a motion to reconsider and reargue on January 25, 2005, which the court denied the following day. On February 15, 2005, the plaintiff filed this appeal from the court's judgment. Additional facts will be set forth as necessary.

I

The plaintiff's first three claims each challenge the financial orders entered by the court at the time of

---

[1] The court awarded the parties joint legal custody of their minor child with the primary residence of the child to be with the defendant.

dissolution and the factual basis underlying those orders. We conclude that the court properly valued the plaintiff's business and awarded alimony and child support, and that its findings are supported by the record.

We review each of these claims under the same standard of review. "In fashioning its financial orders, the court has broad discretion, and [j]udicial review of a trial court's exercise of [this] broad discretion . . . is limited to the questions of whether the . . . court correctly applied the law and could reasonably have concluded as it did. . . . In making those determinations, we allow every reasonable presumption . . . in favor of the correctness of [the trial court's] action. . . . That standard of review reflects the sound policy that the trial court has the unique opportunity to view the parties and their testimony, and is therefore in the best position to assess all of the circumstances surrounding a dissolution action, including such factors as the demeanor and the attitude of the parties." (Citation omitted; internal quotation marks omitted.) *Mann* v. *Miller*, 93 Conn. App. 809, 812, 890 A.2d 581 (2006).

A

The plaintiff first claims that the court's financial orders were improper because the court incorrectly valued his business and the salary he derived therefrom. Specifically, the plaintiff contends that the court could not value the business at $340,000 while also attributing to him a gross income of $138,000 per year. We disagree.

The following additional facts are relevant to our resolution of the plaintiff's claim. The plaintiff began working as a part-time employee at Pronto Printer of Newington, Inc. (Pronto Printer), while attending college and later became a full-time employee. In 1985, the plaintiff purchased a one-half interest in Pronto

Printer from its owner, Peter Miele, for $119,880.[2] The plaintiff subsequently purchased the other one-half interest from Miele in 1989 for $190,000. Presently, the plaintiff is the sole owner of the business, to which the court ascribed a market value of $340,000. Pronto Printer currently employs three full-time employees and one part-time employee, as well as the plaintiff, to whom the court attributed an annual gross income of $138,000 from his business.

The plaintiff claims that the financial orders were improper because the court incorrectly attributed to him a gross income of $138,000 derived from his business, while simultaneously finding that the value of the business was $340,000. To understand why the court properly made both findings, we must begin with the factual basis for each. First, a review of the record reveals a basis for the court's determination that the plaintiff's annual gross income was $138,000. The plaintiff's financial affidavit shows weekly gross earnings of $2655, which, when annualized, totals $138,060.[3] Second, the record also provides a basis for the finding that the value of the plaintiff's business was $340,000. Theresa Renner,[4] an expert witness who valued Pronto Printer, testified that if the annual salary for a manager of the plaintiff's printing business were $75,000, the

[2] The purchase price consisted of two components, $115,000 for the one-half interest and $4880 for inventory.

[3] While the financial affidavit is sufficient support for the court's finding, it is not the only basis in the record for the finding. Theresa Renner, the expert witness who valued Pronto Printer, testified that, on the basis of the plaintiff's financial statements for the nine months ending on September 30, 2004, the plaintiff had received $57,500 in salary and $51,800 in retained earnings shareholder's distributions, a figure which, when annualized, totals $145,733.33. Additionally, from the same financial statements, the plaintiff showed an income of $103,500 from the first three quarters of 2003, which, when annualized, equals $138,000.

[4] Although the defendant initially retained Renner as an expert witness to value the plaintiff's business, Renner was disclosed as an expert by the plaintiff and called as a plaintiff's witness.

value of that business in November, 2004, would be $342,000. "It is the quintessential function of the finder of fact to reject or accept evidence and to believe or disbelieve any expert testimony. . . . The trier may accept or reject, in whole or in part, the testimony of an expert." (Internal quotation marks omitted.) *Sprague* v. *Lindon Tree Service, Inc.*, 80 Conn. App. 670, 677, 836 A.2d 1268 (2003). Accordingly, the court's findings are supported by the record.[5]

We next turn to whether the court abused its discretion by using the $138,000 annual gross income in conjunction with the $340,000 valuation. The crux of the plaintiff's argument is not that the court lacked evidence from which it could determine each figure, but rather that the two findings made together are incompatible. As the foundation of his argument, the plaintiff focuses on Renner's testimony that she used a manager's salary of $75,000 to value Pronto Printer at $340,000, and that if a buyer of the business were to pay someone other than the plaintiff a salary of $135,000 to $144,000, the value of the business would be reduced to $41,000. Essentially, the plaintiff argues that once the court determined that his annual gross income was $138,000, it was bound to determine that the value of Pronto Printer was $41,000. This argument fails. The court, in its discretion, was entitled to value Pronto Printer at the value it would have to a buyer who would pay a manager's salary of $75,000 per year, a reasonable amount for the position.[6] Thus, the court could use both

[5] We note that the plaintiff does not challenge the valuation methods used by Renner or the value of the business calculated for each salary level but merely challenges which of Renner's valuations is utilized appropriately. Accordingly, our analysis similarly is limited in scope.

[6] The $75,000 salary for a printing company manager was used by the plaintiff in a valuation he did of his business. It also is consistent with the $80,000 salary Renner testified about from a range of salaries in a 2002 survey of printers when the highest salary was adjusted for the cost of living in Connecticut.

of its findings together, and its decision to do so is both logical and supported by the record.

B

The plaintiff next claims that the alimony award was improper because the court considered a third party's income. Specifically, the court stated that "[i]n determining [its] alimony award, the court is mindful that the [plaintiff] is living with [his girlfriend]. [His girlfriend] is in a position to contribute more than she does. By her own admission, she offered to pay a portion of the rent and utilities, but the plaintiff has declined. She could, she stated, pay half of those costs. (She works as an operating room nurse. Her gross earnings are about $70,000 per year.)" We are not persuaded that the court acted improperly.

The following additional facts are necessary to our resolution of the plaintiff's claim. During the summer of 2002, the plaintiff became reacquainted with a friend from high school. Despite being married to other people, the plaintiff and his girlfriend began dating and quickly began an intimate relationship. By November, 2002, the plaintiff's girlfriend had moved out of her marital home, and the plaintiff moved out of his marital home the following month. Presently, the plaintiff and his girlfriend live together in a rental house in Higganum. The plaintiff pays the rent and utilities for the home, and the couple shares the expense of groceries. The plaintiff's girlfriend has offered to pay a portion of the rent and utilities. The plaintiff, however, expressly has declined her offers to do so.

The plaintiff first argues that there was insufficient evidence from which the court could find that the plaintiff's girlfriend was in a position to contribute more than she presently does. Specifically, the plaintiff argues

that, given his girlfriend's net income and her expenses,[7] she is unable to make such a contribution. During the trial, by agreement of counsel for each party, the defendant called the plaintiff's girlfriend as a witness. On direct examination, the plaintiff's girlfriend testified that she had sufficient funds to pay one half of the rent for the parties' house and one half of the utilities. In fact, she testified that she has offered to pay those expenses, and the plaintiff has declined. Accordingly, the court's finding that the plaintiff's girlfriend was in a position to contribute more money is supported by the evidence.

We now turn to the plaintiff's second argument, that the court could not consider contributions by his girlfriend when fixing the alimony award.[8] General Statutes § 46b-82 (a) provides in relevant part that "[i]n determining whether alimony shall be awarded, and the duration and amount of the award, the court . . . shall consider the . . . amount and sources of income . . . and needs of each of the parties . . . ." In *Unkelbach* v. *McNary*, 244 Conn. 350, 710 A.2d 717 (1998), our Supreme Court recognized that contributions by a domestic partner to the living expenses of a parent may be included in that parent's gross income for child support determination purposes.[9] Id., 365. In doing so,

---

[7] The plaintiff's girlfriend testified that her expenses included $370 per month for health insurance, $450 per month for car payments and $350 per week for child support.

[8] We note that the plaintiff misinterprets the court's finding. The court did not, as the plaintiff asserts, include his girlfriend's gross income in fixing its alimony order. Rather, the court found that the plaintiff is living with his girlfriend, who is in a position to contribute more to the payment of rent and utilities for their home. Specifically, the court stated that "it's how much she's contributing to the household, and that's what the issue is . . . ."

[9] Pursuant to § 46b-215a-3 (b) (1) (D) of the Regulations of Connecticut State Agencies, the regularly recurring contributions or gifts of a domestic partner now are used as a deviation criteria from the presumptive amount of child support under the guidelines. See *Fish* v. *Igoe*, 83 Conn. App. 398, 405 n.6, 849 A.2d 910, cert. denied, 271 Conn. 921, 859 A.2d 577 (2004). Our decision in no way changes that structure.

the court recognized that its "approach has been to interpret the concept of income broadly so as to include in income items that increase the amount of resources available for support purposes. In cases concerning alimony, we have indicated that regularly and consistently recurring gifts, whether in the form of contributions to expenses or otherwise, are properly considered in determining alimony awards to the extent that they increase the amount of income available for support purposes."[10] Id., 360–61; see also *McGuinness v. McGuinness*, 185 Conn. 7, 12–13, 440 A.2d 804 (1981) (income of plaintiff's second wife properly considered insofar as relevant to plaintiff's current expenses and ability to pay alimony); *Chyung v. Chyung*, 86 Conn. App. 665, 672–73, 862 A.2d 374 (2004) (court properly may have considered domestic partner's contributions to expenses when entering financial awards), cert. denied, 273 Conn. 904, 868 A.2d 744 (2005). In the exercise of its broad discretion, the court was permitted to apply the same rationale to this case. Here, the court had evidence to support its finding that the plaintiff's girlfriend was able and willing to make a regular and consistent contribution to the couple's living expenses, thereby reducing the plaintiff's burden, even though the plaintiff had rejected her offers to do so. The court, therefore, reasonably could have concluded that the plaintiff had additional resources available for support purposes, even though he chose to increase his expenses by supporting his girlfriend. Accordingly, we conclude that the court acted within its discretion.

---

[10] It is appropriate for us to consider child support cases in the present alimony case and vice versa. "The statutory provisions governing awards of alimony and child support employ many of the same criteria. See General Statutes §§ 46b-82 through 46b-86. As a result, [our Supreme Court] has previously held that alimony and child support are issues that are 'entirely interwoven' and require similar treatment." *Unkelbach v. McNary*, supra, 244 Conn. 361 n.4.

## C

The plaintiff next claims that the court did not follow the child support guidelines when entering its order. Specifically, the plaintiff contends that the court improperly (1) attributed to him a gross income of $138,000 and (2) calculated the defendant's gross income.[11] Because the plaintiff's arguments as to the first contention are no different from those already raised, we disagree for the same reasons already set forth. We therefore focus solely on his second contention, with which we also disagree.

The following additional facts are necessary to our resolution of the plaintiff's claim. In the early years of the parties' marriage, the defendant, who has a high school diploma, was employed full-time at South Windsor Bank. When the plaintiff became the sole owner of Pronto Printer in 1989, the defendant left her job with the bank and began to work part-time at Pronto Printer, performing tasks such as bookkeeping and customer service. After the birth of the parties' daughter, the defendant continued to work at Pronto Printer on a reduced schedule. The defendant's employment with Pronto Printer terminated at the time the plaintiff instituted this dissolution action. Thereafter, the defendant found employment with East Catholic High School in Manchester in June, 2003, as a cafeteria worker earning $7.25 per hour. The hours of this job allow the defendant to be home with the parties' daughter, who is still in school. The defendant presently remains employed in this position, working about thirty hours per week during the school year.

---

[11] The plaintiff additionally asserts that "there is no basis for the court ordering any contribution to 'school activit[ies], extracurricular and sports expenses,' " yet offers no substantive discussion or citations to authorities to support his assertion. Accordingly, we deem his claim abandoned. See *Bicio* v. *Brewer*, 92 Conn. App. 158, 172, 884 A.2d 12 (2005).

In his proposed orders, the plaintiff asserted that the defendant has an earning capacity of $20,800 per year and based his proposed child support order of $219 per week on that assumption. In contrast, the defendant asserted that she has an earning capacity of only $9048 per year and based her proposed child support order of $294 per week on that assumption. The court ultimately ordered the plaintiff to pay the defendant $260 per week in child support, which it noted is consistent with the support guidelines and the pendente lite support of the same amount. The court further noted that "[t]he [defendant] does [not] have a demonstrable earning capacity of $20,800 per year as the [plaintiff] claims. She has little work experience to offer, and while she could probably earn more than she currently does once the disruption in her life settles down, based on her skills, background and present employment," it might be limited.

On appeal, the plaintiff now argues that the "failure of the court to determine [the] [d]efendant's earning capacity coupled with its failure to consider [the] [d]efendant's other income[12] completely denies the [p]laintiff the ability to evaluate the order." "It is well established that [i]t is the appellant's burden to provide an adequate record for review. . . . It is, therefore, the responsibility of the appellant to move for an articulation or rectification of the record where the trial court

---

[12] The plaintiff argues that the court did not consider interest the defendant would earn from assets awarded to her in the dissolution. In support of that argument, the plaintiff asserts the inaccuracy of the defendant's proposed orders and the validity of his guidelines worksheet. "[I]t is the trier's exclusive province to weigh the conflicting evidence, determine the credibility of witnesses and determine whether to accept some, all or none of a witness' testimony." (Internal quotation marks omitted.) *Lowe* v. *Shelton*, 83 Conn. App. 750, 765, 851 A.2d 1183, cert. denied, 271 Conn. 915, 859 A.2d 568 (2004). As the court was free to discredit either or both statements, and the plaintiff offers no proof as to what the court actually considered, his argument is unpersuasive.

has failed to state the basis of a decision . . . to clarify the legal basis of a ruling . . . or to ask the trial judge to rule on an overlooked matter. . . . In the absence of an articulation, we presume that the trial court acted properly." (Citation omitted; internal quotation marks omitted.) *Champagne* v. *Champagne*, 85 Conn. App. 872, 879, 859 A.2d 942 (2004). Here, the plaintiff failed to seek an articulation of the court's order to state what it determined the defendant's present income level to be or what her earning capacity might be. Accordingly, we presume that the court acted properly.[13]

## II

The plaintiff next challenges the court's order of the sale of the parties' Vermont property. Specifically, the plaintiff argues that the court improperly ordered the sale of the property without considering the disposal costs or the tax implications of the sale and, thus, depleted the value of the marital estate without due consideration. We disagree.

The following additional facts are relevant to our resolution of the plaintiff's claim. In 2001, the parties purchased for $175,000 a house in Vermont, near Mount Snow, for the purpose of family ski vacations. As part of its financial orders, the court ordered that the Vermont

[13] On the basis of the record before us, we note that the court likely did not abuse its discretion. The court was free to credit the defendant's testimony about her present earning level at $7.25 per hour for thirty hours per week during the school year plus unemployment compensation during the summer. Attributing unemployment compensation at the same level, the defendant earns approximately $11,300 per year, an amount falling between the incomes attributed to the defendant in each of the parties' proposed orders. Even recognizing that the plaintiff may be able to earn more than she presently does at some point in the future, her earning capacity is restrained by her limited education, work experience and child care responsibilities. In light of these findings, a child support order identical to the pendente lite order and falling between the proposed order of each party likely does not reflect an abuse of the court's discretion.

property be sold by a licensed broker. From these proceeds, the court ordered that $75,000 be set aside and held in trust for the college education of the parties' daughter[14] and that the remainder be divided evenly between the parties. In calculating the value of assets apportioned to each party, the court estimated the current value of the property to be $265,000[15] and accordingly credited each party with $95,000.

We decline to review the plaintiff's claim because it was briefed inadequately.[16] "We are not required to review issues that have been improperly presented to this court through an inadequate brief. . . . Analysis, rather than abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly. . . . Where a claim is asserted in the statement of issues but thereafter receives only cursory attention in the brief without substantive discussion or citation of authorities, it is deemed to be abandoned." (Internal quotation marks omitted.) *Bicio* v. *Brewer*, 92

[14] The plaintiff also challenges the creation of the educational support trust and use of these proceeds to fund the trust. We address those claims separately in part III.

[15] In their financial affidavits, the plaintiff and the defendant estimated the current value of the property to be $265,000 and $285,000, respectively.

[16] Even if the plaintiff's claim were briefed adequately, we would still affirm the judgment of the court. The court did not abuse its discretion by failing to specifically state how the capital gains tax and disposal costs would be apportioned. In assigning any value to the parties from the sale of marital property, General Statutes § 46b-81 (c) provides a list of factors the court shall consider. This list, however, does not include the disposal costs or tax implications from the sale of the property. The court, therefore, is not required to speculate as to the potential tax implications of its award. Moreover, we note that the plaintiff has not demonstrated that he has suffered any harm. The court specifically ordered that the proceeds from the sale of the property, less the $75,000 set aside, be divided evenly between the two parties. The court did not, as the plaintiff argues, order that each party receive $95,000 from the sale. Rather, the court *estimated* proceeds to be $95,000 each, because it could not actually assign values when the property had not yet been sold. Any reduction in the proceeds would, therefore, be divided evenly between the parties.

Conn. App. 158, 172, 884 A.2d 12 (2005). Here, the plaintiff recited the relevant facts, and stated his claim that the court acted improperly and that he was harmed by that action. As analysis, the plaintiff then cited merely one Superior Court case in which the court entered orders on taxes and costs but provided no authority that the court must do so. Such cursory attention is insufficient for this court to review his claim on appeal.

## III

The plaintiff's remaining two claims challenge the court's educational support order and allocation of assets to fund the order. We conclude that the record supports the court's decision to enter an educational support order and that the court properly allocated assets to fund the order.

The following facts are relevant to our resolution of the plaintiff's claims. As part of the financial orders entered at the time of dissolution, the court ordered that $75,000 from the sale of the Vermont property be placed into a bank trust account to be used for the college education of the parties' daughter pursuant to § 46b-56c. Any withdrawal of funds from the account requires the signature of both parties. This order, the court stated, "is intended to ensure the daughter's education" if the plaintiff should deplete his assets or income in the future.

## A

The plaintiff first claims that the court's educational support order does not comply with § 46b-56c (c). We agree, in part, but conclude that the court's failure to comply with the statute was harmless.

## 1

The plaintiff first contends that the court did not comply with § 46b-56c (c) because it did not make the

necessary finding that it is more likely than not that the parties would have provided support for their daughter's college education had the family remained intact. Because this claim presents an issue of statutory construction, our review is plenary. See *Kinsey* v. *Pacific Employers Ins. Co.*, 277 Conn. 398, 404, 891 A.2d 959 (2006).

"When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. . . . In seeking to determine that meaning, General Statutes § 1-2z[17] directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. . . . When a statute is not plain and unambiguous, we also look for interpretive guidance to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter . . . ." (Internal quotation marks omitted.) *Kinsey* v. *Pacific Employers Ins. Co.*, supra, 277 Conn. 405.

Accordingly, we begin our analysis with the text of § 46b-56c (c), which provides: "The court *may not* enter

---

[17] General Statutes § 1-2z provides: "The meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered."

an educational support order pursuant to this section *unless the court finds as a matter of fact* that it is more likely than not that the parents would have provided support to the child for higher education or private occupational school if the family were intact. *After making such finding*, the court, in determining whether to enter an educational support order, shall consider all relevant circumstances, including: (1) The parents' income, assets and other obligations, including obligations to other dependents; (2) the child's need for support to attend an institution of higher education or private occupational school considering the child's assets and the child's ability to earn income; (3) the availability of financial aid from other sources, including grants and loans; (4) the reasonableness of the higher education to be funded considering the child's academic record and the financial resources available; (5) the child's preparation for, aptitude for and commitment to higher education; and (6) evidence, if any, of the institution of higher education or private occupational school the child would attend." (Emphasis added.)

In light of the dictates of § 1-2z, we must first determine whether the language of § 46b-56c (c) is plain and unambiguous. We agree with the plaintiff that it is. A statute is plain and unambiguous when "the meaning . . . is so strongly indicated or suggested by the [statutory] language as applied to the facts of the case . . . that, when the language is read as so applied, it appears to be the meaning and appears to preclude any other likely meaning." (Internal quotation marks omitted.) *Kinsey* v. *Pacific Employers Ins. Co.*, supra, 277 Conn. 407–408. Here, the statute clearly provides that the court must make the necessary factual finding *before* it can enter an educational support order. The finding, therefore, merely may not be implied, but must be expressed. We are convinced that § 46b-56c (c), as written, cannot be read in any other manner. This result is not absurd

or unworkable and, therefore, we need not look to extratextual evidence of the meaning of the statute.

With our construction of § 46b-56c (c) in mind, we turn to the educational support order entered by the court in this case. We agree with the plaintiff that the court did not make the necessary finding when entering the order. We nonetheless find the court's failure to comply with § 46b-56c (c) to be harmless. The plaintiff is entitled to relief from the court's improper rulings only if it was harmful. See *Loughlin* v. *Loughlin*, 93 Conn. App. 618, 640, 889 A.2d 902, cert. granted on other grounds, 277 Conn. 926, 895 A.2d 798 (2006). "To meet this burden in a civil case, the appellant must · show that the ruling would likely affect the result." (Internal quotation marks omitted.) Id.

Here, the plaintiff has failed to meet his burden of demonstrating that the court's failure to make the finding was harmful. A thorough review of the record reveals ample evidence to support such a finding, had the court properly entered one. First, both parties, in their proposed financial orders, specifically included provisions for setting aside some funds to provide for their daughter's college education. Second, both parties testified at the dissolution hearing that during the course of their marriage, they had invested in stock with the intent of using some portion of the funds, if appropriate, to provide for their daughter's college education. Finally, during closing argument, each party restated its respective proposal for funding their daughter's college education. We therefore find the court's omission of the factual finding to be harmless. Accordingly, the plaintiff is not entitled to relief from the court's order.

2

The plaintiff further claims that the court did not comply with § 46b-56c (c) because it did not, as the

statute requires, consider all relevant circumstances when entering the educational support order. This claim does not require us to examine the construction of § 46b-56c, but rather its application in the orders rendered by the court. Accordingly, we review the orders to determine whether the court correctly applied the law and reasonably could have concluded as it did. See *Mann* v. *Miller*, supra, 93 Conn. App. 812.

As the basis for his claim, the plaintiff notes that the court incorrectly stated in its memorandum of decision that the parties' daughter was attending East Catholic High School, a private educational institution. We agree that the court made this misstatement because at the time of dissolution, their daughter was only thirteen years old and was in the eighth grade. This mistake, the plaintiff argues, improperly influenced the court because it placed their daughter in a private school and closer to attending college than she actually was. We disagree. The record reveals that the court had evidence of the parties' desire to provide for their daughter's college education, should that become necessary in the future, as well as testimony about their daughter's current grade level, attendance at school and participation in extracurricular activities. Accordingly, notwithstanding the court's misstatement, the court did not abuse its discretion by entering an educational support order to provide for their daughter's higher education, should the need arise.

B

The plaintiff next claims that the court improperly funded its educational support order by creating a trust with proceeds from the sale of the Vermont property. We construe the plaintiff's claim as consisting of two parts: first, that the court could not secure its educational support order with a trust under § 46b-56c, and second, that the court could not fund that trust with

proceeds from the sale. We disagree with each part of the claim.

1

We begin with the plaintiff's claim that § 46b-56c did not give the court the authority to establish the trust to fund its order. We break this claim into two parts: the court's authority to order security, and the court's authority to order a trust as the method of security. We begin with the court's authority to order security for its educational support order. Because this question raises an issue of statutory construction, our review is plenary under the same dictates already discussed. See *Kinsey* v. *Pacific Employers Ins. Co.*, supra, 277 Conn. 404–405.

Our analysis again starts with the text of the statute. Section 46b-56c (h) provides in relevant part that "an educational support order may be . . . enforced in the same manner as provided by law for any support order." We conclude that this language is plain and unambiguous. A court may, therefore, utilize the same means of enforcing an educational support order as it may use to enforce any other support order.

Accordingly, we look to the statutes governing other support orders for the means of enforcing the educational support order. General Statutes § 46b-84 (f), relating to a parent's obligation for maintenance of a minor child, provides in relevant part that "[t]he court shall make and enforce the decree for the maintenance of the child as it considers just, and may direct security to be given therefor . . . ." Similarly, § 46b-82 (a), relating to alimony, provides in relevant part that "[t]he order may direct that security be given therefor on such terms as the court may deem desirable . . . ." As a court may enforce these support orders by requiring that security be given, a court similarly may enforce an educational support order by requiring that security be given.

We now consider whether the court could establish a trust as the means of securing the order. At the onset, we recognize that this court in *Wolf* v. *Wolf*, 39 Conn. App. 162, 171, 664 A.2d 315 (1995), previously has rejected establishing a trust for the education of the parties' children in a dissolution action. In *Wolf*, the funds were expressly designated as the " 'children's property.' " The parties argued that the trust was a form of child support under § 46b-84. Id., 170–71. We rejected that argument, concluding that the designation of funds for the children's education exceeded the statutory limits. Id., 171. Because § 46b-56c now expressly authorizes the court to enter educational support orders and the funds are not the property of the child, this case is inapposite.

"In making its [financial] orders . . . a trial court is afforded a wide latitude of discretion." *Pacchiana* v. *McAree*, 94 Conn. App. 61, 69, 891 A.2d 86 (2006). The creation of a trust to fund an educational support order fits well within that latitude of discretion. In *Louney* v. *Louney*, 13 Conn. App. 270, 274–75, 535 A.2d 1318 (1988), this court upheld an order in a dissolution action requiring that funds held in joint accounts be used for the designated purpose of the education of the parties' minor children. Here, the court similarly established a trust to hold the parties' money for the express purpose of their daughter's college education pursuant to § 46b-56c.[18] We conclude, therefore, that the court was within

---

[18] We note that the funds in the trust remain an asset of each of the parties, until it is used for the express purpose of their child's education pursuant to General Statutes § 46b-56c or the excess is divided equally between them.

We further note that the court did not exceed its authority by funding the trust with $75,000. By establishing the trust pursuant to the statute, the court impliedly included the statutory limitations on the type and cost of expenses the parties are obligated to provide for, as well as circumstances that terminate the parties' obligation. It is possible, therefore, that the amount needed to fund the child's education would be less than that held in trust or even nothing at all. As the court ordered that any excess funds are to be divided equally between the parties, and thus their obligation does not exceed the statutory limits, we conclude that the order does not run afoul of General Statutes § 46b-56c. Contra *Kelman* v. *Kelman*, 86 Conn. App.

its authority to establish a trust as an appropriate means of securing its educational support order.[19]

### 2

Having concluded that the court properly exercised its authority to establish a trust to fund its educational support order, we now turn to whether the court properly funded that order with proceeds from the sale of the Vermont property. The plaintiff argues that the sale of the property was not necessary to fund the order because there were other assets that could have been allocated to that purpose. We are not persuaded. Because this claim implicates the court's application of § 46b-56c, and not statutory construction, we review it for abuse of discretion. See *Mann* v. *Miller*, supra, 93 Conn. App. 812.

General Statutes § 46b-81 (a) provides in relevant part that "[a]t the time of entering a decree . . . dissolving a marriage . . . pursuant to a complaint under section 46b-45, the Superior Court may . . . order the sale of . . . real property, without any act by either the husband or the wife, when in the judgment of the court it is the proper mode to carry the decree into effect." Here, the court made a finding[20] that the plaintiff "may

120, 860 A.2d 292 (2004) (educational support order invalid because not limited to obligations provided for in § 46b-56c), cert. denied, 273 Conn. 911, 870 A.2d 1079 (2005).

[19] As independent grounds permitting the court to order security for its decree, we further note that this court has "recognized that it is within the equitable powers of the trial court to fashion whatever orders [are] required to protect the integrity of [its original] judgment." (Internal quotation marks omitted.) *Wasson* v. *Wasson*, 91 Conn. App. 149, 162, 881 A.2d 356, cert. denied, 276 Conn. 932, 890 A.2d 574 (2005).

[20] As a basis for its order, the court also made a finding that the plaintiff had "during the pendency of this action, by accounting methodology, reduced the value of Pronto Printer . . . ." The plaintiff claims that this finding is not supported by the record. Because we determine that the court's order of security is supported by other findings that are supported by the record, we need not reach this claim.

be considering a sale of the business," which is supported by the record.[21] In the event that the plaintiff sold the business, it is unlikely that he would be able to continue earning $138,000 per year, as the average salary for his position is significantly less. The order, the court noted, is therefore "intended to ensure the daughter's education if that should happen."[22] Accordingly, we conclude that the court did not abuse its discretion by ordering the sale of the Vermont property to secure its decree.

The judgment is affirmed.

In this opinion the other judges concurred.

[21] The plaintiff testified that at some point in the future, he would sell Pronto Printer to his employees, who were looking to start their own business.

[22] We further note, as independent grounds for ordering the sale of the Vermont property, that the court found that the sale also was necessary to protect the defendant's economic future.